K9H6AIYS

```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                        18 CR 333(JGK)

5   AKSHAY AIYER,

6              Defendant.

7   ------------------------------x

8                                        New York, N.Y.
                                         September 17, 2020
9                                        11:30 a.m.

10

11  Before:

12                   HON. JOHN G. KOELTL,

                                         District Judge
13

14                        APPEARANCES

15  AUDREY STRAUSS
         Acting United States Attorney for the
16       Southern District of New York
    KEVIN HART
17       Assistant United States Attorney

18  Willkie Farr & Gallagher, LLP
         Attorneys for Defendant Ayier
19  BY:  MARTIN B. KLOTZ
         JOSEPH T. BAIO
20       JOCELYN M. SHER

21  Also present:  Alexandra Kislvitz

22

23

24

25
```

K9H6AIYS

1          (Case called; videoconference)

2          THE DEPUTY CLERK:  Will all parties please state who

3     never for the record.

4          MR. HART:  Kevin Hart representing the United States,

5     your Honor.

6          MR. KLOTZ:  Martin Klotz representing Mr. Aiyer, your

7     Honor.  I am here with Joseph Baio and Jocelyn Sher of my

8     office, Mr. Aiyer, the defendant, and Alex Kislvitz.

9          THE COURT:  The court reporter is on the phone; is

10    that correct?

11         COURT REPORTER:  I am, your Honor.

12         THE COURT:  A couple of preliminary matters.  We're

13    doing this sentence by Skype video today because there is a

14    national emergency caused by the pandemic.  Our chief judge has

15    also declared an emergency.  The defendant has consented to

16    doing this proceeding by videoconference.  It is necessary to

17    hold the proceeding remotely rather than in person because

18    holding the proceeding in person would seriously jeopardize

19    public health and safety by the presence of so many people in

20    the courtroom.

21         This proceeding cannot be further delayed without

22    serious harm to the interests of justice because the defendant

23    is entitled to a speedy sentence, which has already been

24    delayed.  I offered to put the sentence over further to a time

25    where everyone could be present in court and where we could

K9H6AIYS

1    make the necessary arrangements, for example, for an additional

2    courtroom to accommodate people; but it was the defendant's

3    preference to go forward today understandably and the defendant

4    is entitled to a speedy sentence.  So we're proceeding by

5    videoconference today.

6          One other preliminary matter.  One of my new clerks

7    who started in August worked at a law firm before starting here

8    and had contact with some of the documents related to this case

9    while he was in private practice.  Therefore, he has not worked

10   on the sentence at all.  Although, he may have been involved in

11   setting up this Skype conference.  Nothing about that affects

12   anything that I do in the case.  I always bring these issues to

13   the parties' attention and so I have.

14         I have received the presentence report prepared

15   February 13, 2020, revised March 17, 2020, together with the

16   sentencing recommendation and the addendum.  I have received

17   the defendant's sentencing memo dated April 7th, 2020, and

18   supporting documents.  I received the government's sentencing

19   memo dated April 17, 2020, and the attachments.  I have

20   received the defendant's response dated May 5, 2020.  I have

21   received the defense letter dated August 28, 2020, and the

22   government's letter dated September 11th, 2020, which was an

23   amendment of a previous letter.

24         Let me begin with the calculation of the sentencing

25   guideline range.

K9H6AIYS

1          By the way, I should pause at the outset.  Does anyone

2    want me to make any other findings with respect to sentence or

3    comment on anything that I said so far.

4          MR. HART:  No comment from the government, your Honor.

5          MR. KLOTZ:  No, your Honor.

6          THE COURT:  Okay.  Let me begin with the calculation

7    of the sentencing guideline range based on the parties'

8    submissions.  I think that that would be the most efficient and

9    fair way to deal with the issues so that I can explain to you

10   based upon all of the papers submitted how I have calculated

11   the guidelines sentencing range.  I would then call on each of

12   the parties to find out if there are any other objections to

13   the presentence report and anything that the lawyers and the

14   defendant wants to say with respect to sentence, including

15   anything that they would like to say with respect to a

16   discussion of the 3553(a) factors.

17         Let me begin with the calculation of the sentencing

18   guidelines range based upon the submissions of the parties.

19   First, there is an error in the presentence report as the

20   government points out.  Under the guidelines, the fine range is

21   $20,000 to $1 million and so I will make that change on page 24

22   of the presentence report.

23         Do the parties agree with that?

24         MR. HART:  The government agrees, your Honor.

25         MR. KLOTZ:  Yes, your Honor.

K9H6AIYS

1          THE COURT:  Now, the presentence report calculates the

2     total offense level as 21, the criminal history category as

3     one, and a guidelines sentencing range of 37 to 46 months.  The

4     Probation Office reached this calculation by reaching Section

5     2R1.1 of the guidelines, the guideline for bid-rigging,

6     price-fixing or market allocation agreements among competitors,

7     which has a base level of 12.  The Probation Office added eight

8     levels under 2R1.1(b)(2)(D) based on the volume of commerce

9     attributable to the defendant being more than $100 million.

10     The Probation Office also added one level under 2R1.(b)(1)

11     because the conduct involved participation in an agreement to

12     submit noncompetitive bids.  The Probation Office recommends a

13     downward variance to 24 months' imprisonment.

14          The defendant raises three objections to the

15     guidelines calculations.  First, the defendant contends that

16     there is no evidence of any volume of commerce attributable to

17     the defendant because there is no evidence that the alleged

18     conspiracy actually affected the price of any of the

19     transactions at issue and therefore the 12-level enhancement

20     should be eliminated.  Moreover, the defendant argues that if

21     the enhancement were applied, the defendant should be entitled

22     to a downward departure under Section 5K2.0 of the guidelines

23     because the application of the enhancement in this case would

24     be a circumstance not adequately taken into account by the

25     drafters of the guidelines.  Second, the defendant contends

K9H6AIYS

that there is no evidence that the defendant participated in an

agreement to submit noncompetitive bids.  Third, the defendant

contends that he is entitled to a two-level decrease in the

offense level for a minor-role adjustment under Section

3B1.2(b) of the guidelines.

I will take the objections in order.  First, with

respect to volume of commerce adjustment, I note that the

objection is somewhat academic.  The Probation Office

recommended a downward variance to 24 months.  Based on all of

the submissions and a consideration of all of the 3553(a)

factors, I would not impose a sentence in excess of 24 months.

I am not saying I would even impose a sentence of 24 months.  I

am saying that I would not impose a sentence in excess of 24

months.

The lowest offense level that includes 24 months is

offense level 17.  All other calculations being the same, that

would mean an enhancement for commerce of four rather than

eight levels.  A four-level enhancement applies if the volume

of commerce attributable to the defendant was more than $10

million.  There is no reasonable interpretation of the evidence

in this case that does not include a volume of commerce

attributable to the defendant in excess of $10 million.

Indeed, individual episodes that were plainly in furtherance of

the conspiracy included volumes of commerce done by the

defendant in excess of $10 million; but the Court has an

K9H6AIYS

obligation to calculate the guidelines as a starting point in

the sentencing process and therefore the Court will do so.

The Court begins with the guidelines.  The guideline

provides that the various enhancement levels apply if "The

volume of commerce attributable to the defendant was more" than

the various benchmarks.  The guideline provides: "For purposes

of this guideline, the volume of commerce attributable to an

individual participant in a conspiracy is the volume of

commerce done by him or his principal in goods or services that

were affected by the violation."  However, the guideline does

not provide any definition of "the volume of commerce done by

him or his principal in goods or services that were affected by

the violation."

The background commentary provides some insight.  It

makes clear that volume of commerce is not the same as profits

or actual damages.  The background states: "The agreements

among competitors covered by this section are almost invariably

covert conspiracies that are intended to and serve no purpose

other than to restrict output and raise prices and that are so

plainly anticompetitive that they have been recognized as

illegal per se, i.e., without any inquiry in individual cases

as to their actual competitive affect.  The offense levels are

not based directly on the damage caused or profit made by the

defendant because damages are difficult and time-consuming to

establish.  The volume of commerce is an acceptable and more

K9H6AIYS

1  readily measurable substitute."

2          The parties agree that the most relevant case to

3  interpret the meaning of a volume of commerce affected by the

4  violation is *United States v. SKW Metals & Alloys Inc*., 195

5  F.3d 83 (2d Cir. 1999).  In that case, the conspiracy involved

6  an agreement among competitors to set a floor price for

7  ferrosilicon.  The Court of Appeals concluded that it was error

8  for the district Court to limit the volume of commerce affected

9  to simply sales that were made at or above the floor price.

10 *Id.* 90.  The Court explained: "While the price-fixing

11 conspiracy is operating and has any influence on sales, it is

12 reasonable to conclude that all sales made by defendants during

13 that period are 'affected by the conspiracy.' Here, once it was

14 found that the price-fixing conspiracy was successful during

15 two periods, it was error to calculate the affect on commerce

16 solely in terms of sales that were made at or above the target

17 price without considering as well the sales prices that were

18 influenced without hitting or exceeding the target price or

19 sales that were affected in other ways."  *Id.*

20         The Court of Appeals also rejected the government's

21 argument in *SKW* that all sales during the period of the

22 conspiracy should be included because it was possible that

23 there could be a conspiracy with an overt act that "fails to

24 influence market transactions."  *Id.* 91.

25         The government in this case does not commit the error

K9H6AIYS

1  that the Court of appeals pointed out the government had

2  committed in this case because it does not seek to include the

3  total volume of transactions that the defendant engaged in in

4  the Forex market for CEEMEA currencies during the period of the

5  conspiracy.  Rather, the government has focused on 14

6  transactions, the total volume of commerce for the defendant of

7  $231,426,386.  The government's calculation is based on the

8  trial exhibits and the expert summary and is reasonable.  It

9  includes the volume of the transactions as reflected in the

10  trial exhibits based on the volume from the beginning of the

11  conversations among the conspirators about a transaction in

12  furtherance of the conspiracy to the end of the transaction.

13  The defendant contends in each case that there was not in fact

14  any affect on price and that the defendant did not intend to

15  violate the law.

16          In analyzing those transactions, the touchstone is the

17  guidance of the Court of appeals in the *SKW* case that the issue

18  is whether the sales prices were influenced or the sales were

19  affected in other ways.  The Court of Appeals further

20  explained:  "A conspirator profits from an agreement to fix

21  prices when the conspiracy is incrementally successful at

22  impacting the terms of trade or at elevating the price above

23  the punitive market price regardless of whether the target

24  price is achieved.  A finding as to the volume of affected

25  commerce does not require a sale-by-sale accounting or an

K9H6AIYS

1    econometric analysis or expert testimony.  The Court may

2    consider the goals of the conspiracy and the steps taken to

3    implement it, the market share of the conspirators, and the

4    persons with whom they transacted business and may otherwise

5    deduce the affect on commerce from the pressures brought to

6    bear on it."  *Id.* 91.

7         The Court has already exhaustively examined the

8    evidence in this case and found that there was more than

9    sufficient evidence to find that the government proved beyond a

10   reasonable doubt that the defendant was a member of a

11   conspiracy to fix prices and rig bids in the market for CEEMEA

12   currencies.  The defendant and his co-conspirators worked for

13   four of the largest banks in the market and dealt with large

14   sophisticated customers who expected that the banks would

15   compete to offer them the best prices when in fact the

16   conspirators did not compete but conspired to fix prices and

17   rig bids.

18        In its lengthy submission, the defendant repeats the

19   arguments that the Court rejected in denying the motion for

20   acquittal or a new trial.  It is unnecessary to repeat all of

21   the arguments here, particularly in view of the Court of

22   Appeals' admonition that a finding of the volume affected does

23   not require a sale-by-sale accounting.  However, it is useful

24   to illustrate several of the transactions to justify an

25   enhancement for a volume of more than $100 million of commerce

K9H6AIYS

1    done by the defendant that was affected by the conspiracy.  In

2    doing this summary, I have relied on some of the transactions

3    used by the government in its calculation and which were

4    discussed at length in the Court's prior opinion.

5          In the October 14, 2010, transaction that the Court

6    analyzed in its prior opinion, the Court explained how the

7    defendant and Katz worked together to move the price of a

8    dollar-ruble pair higher to their benefit and to the

9    disadvantage of a customer.  This transaction involved

10   $5,493,960 for the defendant.  On November 4, 2010, the

11   defendant and Katz coordinated their bids to a customer for a

12   dollar-ruble transaction so that Katz would show a slightly

13   lower price and the defendant would get the transaction.  By

14   showing a slightly lower price, Katz was also able to show that

15   he was giving a competitive bid or apparently to the customer

16   giving a competitive bid.  It was after this transaction that

17   Katz commented to the defendant, "Conspiracies are nice," and

18   defendant said, "Ha, ha, ha.  Probably shouldn't put on Perma

19   chat."  The volume of commerce involved for the defendant was

20   $29,617,619.

21         The defendant claims that no volume of commerce was

22   involved because the defendant did not change the bid that he

23   had originally quoted to Katz.  That ignores the admonition of

24   the Court of appeals that sales may be affected in ways other

25   than price.  The *SKW* court did not deal directly with a

K9H6AIYS

1    bid-rigging conspiracy, but if conspirators agree that one

2    conspirator will get the sale and another conspirator is to bid

3    in a way to appear to be competitive, a deliberately loose bid,

4    the terms of the sale are plainly affected, namely, who gets

5    the bid.  This amount should also be included in the volume of

6    commerce affected for the defendant.

7            On December 21, 2001, both the defendant and Katz were

8    short dollars against the Turkish lira, which meant that they

9    would both profit if the price of dollars fell to essentially

10   buy dollars against the Turkish lira at a lower price.  The

11   defendant and Katz agreed that Katz would hide the defendant's

12   buying interest in the dollars against lira in order to prevent

13   pushing the price of dollars higher.  After a customer

14   transacted with Katz, Katz then sold $3 million to the

15   defendant, which meant as Katz testified the plan worked.  The

16   volume of commerce involved in this transaction for the

17   defendant was $10 million.

18           On January 18, 2012, the defendant together with

19   Cummins and Katz pushed the price of the dollar-rand pair lower

20   so that the defendant would trigger a stop-loss order that he

21   had from Putnam Investments.  The stop-loss order was in fact

22   triggered.  At the end of the day, the defendant told Cummins

23   and Katz on the Bloomberg Chat:  "BTW"-- by the way- "salute to

24   the first coordinated czar effort," to which Katz responded,

25   "Yep.  Many more to come."

K9H6AIYS

1          The defendant attempts to discount this transaction by

2     arguing that he acted prudently in selling in view of market

3     conditions and that the stop-loss would have been triggered in

4     any event.  None of these arguments eliminate the volume of

5     commerce that the defendant engaged in in a successful

6     coordinated effort with his co-conspirators to drive the price

7     down and thereby trigger the stop-loss order for his client.

8     The volume of commerce attributable to the defendant from this

9     effort is $46,325,807.

10          On February 28th, 2012, the defendant, Williams and

11     cummins had each received a request from the same customer to

12     sell dollars in exchange for rubles in a forward transaction.

13     Williams was showing a price of 29.05, Cummins was showing

14     29.06 and the defendant was showing 29.10, the best price for

15     the customer.  Based on the information, the defendant moved

16     his price to 29.08 -- better for him and worse for the

17     customer; but the defendant knew he could win the bid, which he

18     did, because he knew the prices of his competitors.  After the

19     defendant won the bid, he shared the information with the

20     others.  Plainly the price of the transaction was affected by

21     the conspiracy.  The volume of commerce affected was $5

22     million.

23          There were two transactions on May 20, 2013, that were

24     discussed in the Court's prior opinion.  In one transaction the

25     defendant was short Euros against the Czech koruna and sought

K9H6AIYS

1    to buy Euros.  Katz had been buying Euros and the defendant

2    told Katz to "stop running this Euro-Czech in my face."  Katz

3    responded by canceling his trade in order to keep the price

4    lower for the defendant.  The volume of commerce from this

5    transaction was $2,690,500.

6         In a second transaction that day, the defendant and

7    Katz needed to buy Turkish lira in exchange for dollars.  After

8    they realized that the defendant needed the larger amount, Katz

9    told the defendant to go ahead of him and the defendant then

10    traded in the market.  The total amount of commerce involved in

11    this transaction was $3 million for the defendant.  The

12    combined total of these transactions was $5,569,500.

13         The combined total of the volume of commerce for the

14    defendant involved in these transactions was $102,006,886 which

15    supports the Probation Office adjustment of eight levels for a

16    volume of commerce done by the defendant that were affected by

17    the violation.  I have relied on the transactions that were

18    discussed at length in this Court's prior opinion denying the

19    motion for a judgment of acquittal and for a new trial and that

20    the government included in its calculation in its sentencing

21    memorandum and the attached exhibits.  My descriptions were in

22    turn based on the trial record.

23         I appreciate that the government relied on additional

24    transactions and concluded that the volume of commerce was in

25    excess of $230 million.  However, it is unnecessary to discuss

K9H6AIYS

1    and analyze the additional transactions because an enhancement

2    of eight levels is triggered by a volume of commerce

3    attributable to the defendant of more than $100 million.

4    Moreover, it is useful to note that an adjustment of four

5    levels applies for a volume of commerce in excess of $10

6    million and an adjustment of six levels is triggered by a

7    volume of commerce in excess of $50 million.  To analyze

8    further transactions would truly be academic at this point.

9            The defendant seeks a downward departure under Section

10   5K2.0.

11           I should say not only academic but would not affect

12   the Court's sentence in any way.

13           The defendant seeks a downward departure under Section

14   5K2.0 of the guidelines on the grounds that using the volume of

15   commerce results in a circumstance not adequately taken into

16   account by the guidelines for substantially in excess of that

17   taking into account by the guidelines particularly because the

18   defendant's profits were so much less than the volume of

19   commerce.  There is no basis for such a departure.  The volume

20   of commerce was plainly a carefully crafted adjustment.

21           The background commentary explains that "tying the

22   offense level to the scale or scope of the offense is important

23   in order to ensure that there is an incentive to desist from a

24   violation once it has begun.  The offense levels are not based

25   directly on the damages caused or profit made by the defendant

K9H6AIYS

because damages are difficult and time-consuming to establish.
The volume of commerce is an acceptable and more readily
measurable substitute." Nor is the defendant correct that the
scope of the adjustment is a circumstance not adequately taken
into account by the guidelines.

The scope of the defendant's conspiracy was vast and
it compromised the integrity of an important marketplace and
harmed customers who mistakenly thought that they were dealing
with honest competitors.  The scope of the enhancement should
not be reduced simply because the defendant dealt in
transactions involving millions of dollars.  Therefor, the
defendant's objection to the eight-level adjustment is
overruled.

The defendant objects to the one-level adjustment for
"conduct that involved participation in an agreement to submit
noncompetitive bids" pursuant to 2R1.(b)(1).  Initially the
defendant argued that this enhancement should only apply to
schemes involving bid rotation.  The application notes to the
guidelines did refer to bid rotation as one example where if
the defendant did not in turn win a bid, there would be no
volume of commerce for the defendant although the defendant
contributed to the harm from the scheme and the Court should
consider a sentence near the top of the guideline range in such
a case (n. 6).  However, the guidelines do not suggest that
that is the only example of an agreement to submit

noncompetitive bids.  The background commentary goes onto

state:  "The commission believes that the volume of commerce is

liable to be an understated measure of seriousness in some

bid-rigging cases.  For this reason and consistent with the

pre-guideline practice, the Commission has applied a one-level

increase for bid-rigging."

The defendant contends that there was no evidence of

bid-rigging.  However, the Court already rejected that argument

when it denied the defendant's motion for a judgment of

acquittal.  The Court found that there was ample evidence from

which a reasonable jury could conclude that the defendant

participated in a conspiracy to fix prices and rig bids.  The

Court also pointed out that the defendant did not object to the

Court's instructions on the definition of bid-rigging.  There

is no basis to reconsider those rulings as objections to the

one-level upward adjustment for bid-rigging.

The defendant also relies on *United States v.*

*Sturdivant*, 244 F.3d 71 -- although, I may not have that cite

correct in my notes-- (2d Cir. 2001).  That case has nothing to

do with the guideline enhancement for bid-rigging.  *Sturdivant*

was a case about a duplicitous narcotics indictment.  The court

already rejected the argument that the indictment in this case

was duplicitas and there is no basis to reconsider that

conclusion.  Therefore, the objection to the one-level

adjustment for bid-rigging is overruled.

K9H6AIYS

         The defendant contends that he should be afforded a

two-level downward adjustment pursuant to 3B1.2(d) for

allegedly being a minor participant in the criminal activity.

The argument is completely without merit.  The commentary to

2R1.1 stresses that a mitigating adjustment will be rare.

Application Note 1 points out that "an individual defendant

should be considered for a mitigating role adjustment only if

he were responsible in some minor way for his firm's

participation in the conspiracy."  In this case, of course, the

evidence indicates that the defendant was the primary person at

his employer bank who participated in this particular

conspiracy.  The background commentary also points out that the

mitigating role in the offense will apply "in rare

circumstances."

         There is no reasonable argument that the defendant

qualifies for a minor-role adjustment.  A minor-role adjustment

applies to a participant who plays a part in committing the

offense that makes him substantially less culpable than the

average participate in the criminal activity.  A minor

participant is less culpable than most other participants in

the criminal activity, but his role could not be described as

minimal.  The application notes instruct the Court to consider

the following non-exhaustive factors:

              A, the degree to which the defendant understood

the scope and structure the criminal activity;

K9H6AIYS

1          B, the degree to which the defendant participated

2    in planning or organizing the criminal activity;

3          C, the degree to which the defendant exercised

4    decision-making authority or influenced the exercise of

5    decision-making authority;

6          D, the nature and extent of the defendant's

7    participation in the commission of the criminal activity; and

8          E, the degree to which the defendant stood to

9    benefit.

10         All of these factors demonstrate that the defendant

11   was a full participant in the conspiracy along with Katz,

12   Cummins and Williams.  He understood the scope of the

13   conspiracy and was an eager participant in the numerous

14   transactions outlined in the opinion denying the motion for

15   judgment of acquittal or a new trial.  He participated in

16   planning and organizing individual trading events or refraining

17   from trading and he stood to profit from the transactions in

18   the same way as other participants.  The only real argument the

19   defendant raises is that others participated in a prior

20   conspiracy before the defendant joined this conspiracy, but

21   that in no way minimizes the defendant's participation in the

22   conspiracy that was proven at trial.  Therefore, the

23   defendant's argument for a minor-role adjustment is denied.

24         Therefore, the Court concludes that the Probation

25   Office correctly calculated that the total offense level is 21,

namely, 12, pursuant to 2R1.1, plus one for bid-rigging scheme under 2R1.1(b)(1), plus eight for the volume of commerce adjustment excess of $100 million under 2R1.1(b)(2)(D) for a total of 21.  The criminal history category is one and the guidelines sentencing range is 37 to 46 months.

I will now call on the lawyers and the defendant to hear if they have reviewed the presentence report, the recommendation and addendum, whether they have any additional objections and I will listen to them if for anything else they would like to tell me in connection with sentence, any statement that they would like to make, anything that they would like to tell me in connection with the 3553(a) factors or otherwise any statement at all they would like to make.

I ask those two questions -- are there any other objections and anything else that the parties would like to tell me -- because under the rules if there are objections to the presentence report, I have to rule on them and determine them or determine that they wouldn't affect the sentence.  So that's why I call on the parties with two questions.  Any other objections that I haven't dealt with and then I listen to anything that the parties want to tell me in connection with sentence.

So, first of all, for the defendant.  Mr. Klotz, have you reviewed the presentence report, the recommendation, and the addendum and have you it discussed them with the defendant?

1              MR. KLOTZ:  Yes, your Honor.

2              THE COURT:  You are welcome to say anything about

3    those objections, too, if you want; but do you have any other

4    objections to the presentence report?

5              MR. KLOTZ:  Your Honor, we made a series of objections

6    to some of the factual background description in the

7    presentence investigation report that we communicated to the

8    Probation Department.  They have accepted some of our factual

9    proposed corrections and rejected a number of others; but I

10    don't believe that they have any impact on the calculation of

11    the sentencing guidelines and I don't ask your Honor to resolve

12    them because I think they are just different ways that we would

13    describe the conduct.

14              There is one which may seem very minor that I think we

15    would ask for it to be corrected, and that is in the section of

16    the presentence investigation report entitled Identifying Data.

17    The presentence investigation report indicates that Mr. Aiyer

18    has an alias, which is identified as Ashkay as opposed to

19    Akshay.  As I said this is a relatively minor matter but I

20    understand an alias to be a different name that somebody goes

21    by often with the implication that they are trying to conceal

22    their identity.  Mr. Aiyer does not go by Ashkay.  It is a

23    mistaken pronunciation of his name or writing of his name, and

24    I think that is appropriately deleted.

25              THE COURT:  What page of the presentence report?

K9H6AIYS

1          MR. KLOTZ:  One minute, your Honor.

2          The alias identified is Ashkay, A-s-h-k-a-y.

3          This is at -- of the presentence investigation report.

4          THE COURT:  Right.  What page.

5          MR. KLOTZ:  Page 3.

6          THE COURT:  I am sorry.  I didn't hear you.

7          What paragraph?

8          MR. KLOTZ:  It's the very bottom of that page.  The

9    top of the page says, Identifying Data.  The last entry is

10   aliases and it indicates "Aiyer, Ashkay" and I would ask that

11   that be amended to read "none."

12         THE COURT:  All right.  Does the government want to be

13   heard?

14         MR. HART:  No, your Honor.  The government does not

15   have an objection to that.

16         THE COURT:  I will change on page 3 the aliases.  I

17   will strike what is there now and write in "none."

18         MR. KLOTZ:  Finally, your Honor, with respect to

19   calculation of the volume of commerce and the overall offense

20   level, I don't want to repeat things that are in our papers;

21   but in preparing for today's session, I did come across a point

22   that goes in my judgment directly to our argument that Mr.

23   Aiyer is entitled to a downward departure because the volume of

24   commerce overstates the significance of the activity.  What I

25   would want to bring to your Honor's attention is that in

K9H6AIYS

discussing the relevant fine for an antitrust offense, the

sentencing guidelines while indicating that profits are

difficult to calculate and volume of commerce is an easier and

more ready way of calculating something that indicates the

profit to the defendant or the impact on commerce, in a note to

Section 2R1.1 -- it's n. 3, the guidelines state that it is

estimated that the increase in price when transactions are

affected by an illegal antitrust conspiracy is 10 percent of

the gross volume of the transaction.  I am not giving a

verbatim quote, but that is the substance of it.

          In other words, it indicates that the Sentencing

Commission had in mind that typically the benefit to the

defendant would be in the range of 10 percent of the total

volume of commerce.  In this case, it is demonstrable that the

benefits of the defendant -- and by benefits of the defendant,

I am now talking about the benefit of the bank -- is nowhere

even remotely close to 10 percent of the volume of commerce.

The best illustration of that is the transaction on

February 28th, 2012, where there is an adjustment in the price

quoted to the client from 29.10 rubles to 29.08.

          As our papers said if you do that calculation, the

benefit to J P Morgan Bank is $3,300.  To Mr. Aiyer it is about

$165.  The sentencing guideline rule of thumb would indicate

that a transaction of that size should have a benefit to the

defendant bank of $500,000, which is 150 times greater than the

K9H6AIYS

1   actual benefit amount, which is readily calculable.  I simply

2   put that out there not just for the calculation of the

3   sentencing guidelines but because under 3553 addressing the

4   overall significance of the behavior here, I think it puts it

5   in a different context that relatively minimal amounts are

6   involved both for the bank and for sure for Mr. Aiyer.

7           THE COURT:  Mr. Hart, do you want to comment?

8           MR. HART:  Yes, your Honor.

9           What the defendant is referring to is something

10  separate as it relates to the overall calculation of the volume

11  of commerce.  So his points can be contributed to 3553, but

12  there shouldn't be attached much weight to it.

13          THE COURT:  All right.  What defense counsel raises is

14  not in my view a reason for a downward departure from the

15  volume of commerce adjustment in the guidelines.  I have gone

16  through a lengthy consideration of that particular enhancement

17  both from the standpoint of the commentary to the guidelines

18  and the Court of Appeals decision.  It is a measure -- one

19  measure -- of the significance of the conspiracy to determine

20  the volume of commerce affected irrespective of what the

21  ultimate profit is to the bank or to the individual employee.

22  What is involved are transactions worth millions of dollars in

23  which sophisticated customers go to huge banks as the only

24  institutions capable of dealing with these types of

25  transactions.  So a measure of the affect of the conspiracy is

K9H6AIYS

1    volume of commerce.

2         The volume of commerce is carefully thought out in the

3    guideline and it's also carefully limited because it doesn't as

4    in some other context involve the total volume of commerce

5    involved in the conspiracy for example.  It doesn't include

6    what is happening with the other conspirators and their

7    institutions.  It involves only the defendant personally.  So

8    it's not I think a good argument in favor of a downward

9    departure.

10         On the other hand, surely the profit to the defendant

11   is one aspect that can be taken into account under the 3553(a)

12   factors.  The Court has broad discretion in considering the

13   3553(a) factors in arriving at a sentence that is sufficient

14   but no greater than necessary to accomplish the relevant goals

15   of sentencing.  So I agree it is something that the Court can

16   take into account for the 3553(a) factors, and you are welcome

17   to expand on that in a moment.

18         MR. KLOTZ:  Would you like me to --

19         THE COURT:  Hold on.  Hold on.  I want to make sure

20   that I have finished with whether you have any other objections

21   to the presentence report.

22         MR. KLOTZ:  We are finished, your Honor.

23         THE COURT:  Okay.  So now I will listen to you for

24   anything that you would like to tell me in connection with

25   sentence, anything you would like to tell me, anything you

K9H6AIYS

1    would like to discuss, anything at all.

2              MR. KLOTZ:  Thank you, your Honor.

3              Let me start with the amount of money at stake from

4    the defendant's point of view since that was what we were just

5    discussing.  It goes, your Honor, both to an appropriate

6    sentence and to the amount of the fine, which under the

7    sentencing guidelines is teed off of the volume of commerce but

8    intended to penalize the defendant for the benefit that he got

9    from the illegal conduct.

10             My point in both regards is simply the one I already

11   made.  I think it is fairly ascertainable that the actual

12   benefit to the defendant in this case of all of the conduct

13   proven at trial is in maybe the thousands of dollars and the

14   benefit to his bank is certainly under a million dollars and

15   probably quite a bit under that.  I ask your Honor to take that

16   into account in assessing the seriousness of the offense and

17   the appropriate level of a fine in the case.

18             THE COURT:  The benefit to the bank was millions of

19   dollars?

20             MR. KLOTZ:  I think less.  I think the benefit to the

21   bank in the February 28 transaction, for instance, was $3,300.

22   That transaction is about 150th of the total volume of commerce

23   that was argued by the government.  And if you multiply $5300

24   by 50 you get about $150,000.  I think that is a fair estimate

25   of the benefit to the bank of all of the conduct at issue here.

K9H6AIYS

1    As we put in our papers, rough calculation, Mr. Aiyer was

2    compensated about 5 percent of the profits that he generated

3    for the bank.  So if the benefits of the bank was about

4    $150,000 give or take, the benefit to Mr. Aiyer was in the

5    range of five or $10,000.

6         Now, you can quarrel with that number I suggest to

7    some degree, but I think that's the order of magnitude that we

8    are talking about and I think it's important.  Now, I

9    understand that a large volume of commerce was involved and

10   that is a different measure and maybe appropriately taken into

11   consideration as well; but it seems to me it is also

12   appropriate to look at what the defendant personally had at

13   stake here in assessing the conduct at issue.

14        Then without repeating matters that we've discussed at

15   some length in our submissions, I just want to highlight for

16   your Honor various different considerations that I think the

17   case law allows your Honor to take into consideration in

18   reaching a just and fair sentence in this case.  First and

19   foremost, I think your Honor is entitled to and should consider

20   the fundamental decency as a human being that Mr. Aiyer has

21   shown throughout his life.  I don't want to repeat all that was

22   written by his friends and family on his behalf; but it is

23   clear that Mr. Aiyer from a very young age connected with

24   people and cared for other people very much.  He is portrayed

25   in the letters as an incredibly kind, caring and compassionate

K9H6AIYS

person.  I has never had any trouble with the law before.  He

not a danger to the community.

        Just some of the letters that talk about those

features of Mr. Aiyer as a person really stand out.  To me one

of them was a friend who was on his way to the emergency room I

think when his spouse was out of town and was experiencing a

medical emergency and the person to whom he turned was

Mr. Aiyer.  Mr. Aiyer came to his assistance and went to the

hospital.  I believe had the person come home with him.  But

that is illustrative of what you see in the letters on

Mr. Aiyer's behalf.  Over and over and over again of people

talking about instances where he reached out in order to do

something to benefit them without any regard for his personal

interests.

        He has also made concerted efforts to give back to his

community at large.  For example, until the pandemic shut down

normal school function, Mr. Aiyer served for six months as a

volunteer math tutor in a program called Top Honors.  He spent

three hours every Wednesday with a seventh grade student with

skills that translate to roughly a fourth-grade level.  The

friend that introduced Mr. Aiyer to the program explains that

because of Mr. Aiyer's phenomenal tutoring and mentoring

capacity, this student has been thriving.  That program was

suspended; but when it picks up again later in the school year,

Mr. Aiyer will continue to participate in it.

1          Next, we have cited cases, and I don't think there is

2     an argument that your Honor may consider in fashioning an

3     appropriate sentence the collateral consequences to Mr. Aiyer

4     independent of the sentence that your Honor imposes.  I would

5     like to highlight two of those collateral consequences

6     specifically.  One is that as a result of is this

7     investigation, trial and conviction Mr. Aiyer has lost his job

8     and will clearly not work in financial services ever again in

9     his life.  That's relevant because it goes to the need for

10    specific deterrence.  Mr. Aiyer is not going to be in a

11    position to commit this kind of crime again.  It is also a very

12    serious penalty that is imposed on him over and above anything

13    that your Honor can do in fashioning a sentence.

14          Secondly, I submit that the length of time that

15    Mr. Aiyer's life has been disrupted by this investigation and

16    trial is unusually long and is a special circumstance that

17    itself could be considered.  Any criminal defendant is

18    inconvenienced by an investigation and trial that puts his life

19    in limbo for some period of time, but the six years that

20    Mr. Aiyer's life has been in limbo is unusually long.  This was

21    a very lengthy investigation with charges brought at the end or

22    near the end of any arguably statute of limitation; and then,

23    as your Honor has noted, after that the proceedings have been

24    delayed many months through nobody's fault but as a result of

25    the pandemic.  I think your Honor is entitled to take into

K9H6AIYS

1    consideration that burden that Mr. Aiyer has borne, which has

2    been quite extraordinary.

3          Third, one of the goals of sentencing is to prevent an

4    unwarranted disparity in sentences.  Typically that unwarranted

5    disparity pertains only to persons who have been charged with

6    similar offenses and convicted and the Court looks to what

7    other people who have been convicted of this crime been

8    sentenced and it is of no relevance that there may have been

9    other people who committed the same or similar crime and were

10   not detected, were not prosecuted.  We all know that the

11   government has great discretion.

12         I think Judge McMahon's sentencing decision in the

13   *Connelly* case is highly relevant to this case.  Because Judge

14   McMahon found that granting that usually the fact that the

15   government has exercised its discretion to charge some people

16   and not others ought not be a relevant consideration.  The

17   calculation changes somewhat when the conduct at issue is

18   endemic to an industry and literally dozens and possibly

19   hundreds people engaged in it but only a small handful are

20   selected as examples.  In the *Connelly* and *Black* case, the

21   Judge McMahon decision, the conduct at issue was manipulation

22   of LIBOR.  Judge McMahon found that this was an enormously

23   widespread problem in the industry and that it indicated that

24   the defendant in her case ought not be penalized especially

25   because he had the band fortune to be picked as an example to

K9H6AIYS

1    to send a message to the industry.

2            The misuse of chat rooms by currency traders is

3    similarly endemic.  As the government has repeatedly stated,

4    virtually all of the major banks internationally were involved

5    in these investigations.  Dozen and dozens of people have lost

6    their jobs and at the same time very few individuals have been

7    prosecuted and Mr. Aiyer I think is probably the only one of

8    them who is at risk of getting a jail sentence.  As Judge

9    McMahon put it in the *Connelly* case that just doesn't seem fair

10   that the one person who has the bad luck to be prosecuted is

11   the person who gets that consequence.

12           Next, we cited cases that indicate that you can

13   consider the special consequences that flow from Mr. Aiyer's

14   status as a legal noncitizen.  These include the risk of

15   deportation proceedings and the added stress that that places

16   on him but also the fact that a 2018 Bureau of Prison

17   memorandum requires that Mr. Aiyer be assigned to a low-quality

18   private prison for noncitizen probably at a great distance from

19   New York, which makes his service of a prison term not

20   certainly but very likely considerably more burdensome than the

21   same sentence would be if it were imposed on a citizen.  Again,

22   Judge McMahon in the *Connelly* case felt that this was an

23   appropriate factor to take into consideration and again her

24   conclusion was this is just not fair that this defendant before

25   me would have to suffer much more severe terms of incarceration

1    than an absolutely equally positioned citizen.

2              The government hasn't come back with much to suggest

3    that Mr. Aiyer would not be at a very high risk of going to one

4    of these private facilities.  They cite a case from 2014,

5    *United States v. Robson*, in which the defendant didn't go to a

6    private facility for noncitizens, but that was before the 2018

7    policy memorandum of the Bureau of Prisons requiring that

8    noncitizens be sent to such facilities.  Additionally as a

9    noncitizen, Mr. Aiyer, whether or not he goes to a private

10   facility, would not in the ordinary course be entitled to

11   assignment to a minimum security camp.  He would have to at a

12   minimum go to an actual prison facility and he would be

13   ineligible for release to a halfway house after part of his

14   sentence.

15             Finally, the Court clearly can consider the current

16   pandemic as a factor that should figure in framing an

17   appropriate sentence.  The argument is not that a prison

18   sentence is never appropriate because of the pandemic but that

19   in light of the pandemic that is an additional factor that

20   militates in favor of leniency.

21             I want to say a couple of things about the

22   government's most recent letter which we have not responded to

23   in writing because we didn't want to burden your Honor with

24   additional paper.  Just three very quick points about that.

25   First, we cite a couple of cases where defendants whose

K9H6AIYS

1    sentencing guidelines range was comparable to Mr. Aiyer

2    received noncustodial sentencings.  The government responded,

3    oh, but those cases are different.  And the first thing they

4    said about those cases, which I think they repeated and I think

5    they said this in earlier papers distinguishing cases we cited,

6    was that the defendant in those cases pleaded guilty as opposed

7    to the defendant here.

8         Well, as your Honor knows perfectly well, the

9    sentencing guidelines for a defendant that pleads guilty

10   already incorporate a discount for the fact that they pleaded

11   guilty and there is ample case law that a defendant other than

12   this discount that is built into the guidelines for a guilty

13   plea, a defendant ought not be further penalized for exercising

14   his right to proceed to trial.  I submitted that that is

15   particularly important here where it is clear that the

16   potential immigration consequences of a conviction, whether by

17   plea or by trial, made it much more difficult for Mr. Aiyer to

18   contemplate a plea compared to a normal defendant who is a U.S.

19   citizen and would not have that added consequence of a

20   conviction.

21        THE COURT:  The government distinguished one of the

22   cases by saying even though the sentence was "time-served," the

23   defendant had already spent 14 months in custody.

24        MR. KLOTZ:  Yes.  That was another distinguishing

25   feature, but that case along with the other one the government

1    said keep in mind that both of these people pleaded guilty when

2    we said they both were subject to comparable sentencing

3    guidelines ranges.

4          The government argued in its letter that Mr. Aiyer

5    overstates the certainty of facing adverse consequences for

6    being a noncitizen.  It is our understanding that the adverse

7    consequences that he faces from being a noncitizen are current

8    Department of Justice and Bureau of Prison policy.  We

9    recognize that that doesn't mean it is a certainty, but that

10   means that any deviation from the policy of the Department of

11   Justice and Bureau of Prison is likely to be rare and/or

12   unintentional.

13         Finally, the government argues that Mr. Aiyer

14   overstates his personal risk from COVID-19 especially in light

15   in steps taken by the Bureau of Prisons to control the spread

16   of the disease.  We all understand the seriousness I think,

17   your Honor, of the COVID pandemic.  Mr. Aiyer is not arguing

18   that he is certain to contract COVID-19 if imprisoned or

19   certain to have a severe case if he contracts it, but much is

20   unknown about who is at greatest risk from the disease.

21   Prisons are clearly at-risk institutions.  Mr. Aiyer has

22   sufficiently severe asthma to require regular use of an inhaler

23   and his asthma was sufficiently bad this past spring that

24   required a course of steroids as a treatment.  His argument is

25   that the prevalent of COVID-19 is an added burden of unknown

K9H6AIYS

significance that attaches to any sentence of imprisonment.

Finally, I want to address the specific significance of a period of incarceration of a year or more as distinct from a sentence of incarceration or home detention of less than a year.

If Mr. Aiyer is given a prison sentence of a year or more, it is again the policy of the immigration authorities, ICE, to lodge a detainer against such a person and take them into custody at the conclusion of their sentence.  They also may do that in the case of anyone who gets any sentence of imprisonment, but it is less likely if the sentence of imprisonment is less than a year as distinct from a year or more.  Perhaps more importantly if Mr. Aiyer is taken into custody by ICE at any point for any reason to commence removal proceedings if his sentence of incarceration is a year or more, his standard of being released pending the completion of those removal proceedings is much higher and much more difficult to meet.  It is not the usual standard for release on bail of not being a danger to the community or risk of flight.  He would have to prove in addition at the release-on-bail stage that he was likely to prevail on the merits.

Now, if ICE were to bring removal proceedings against Mr. Aiyer, he would contest them because he does not believe he should be subject to removal, but those proceedings could last a very long time.  If he gets a sentence of a year or more

1    incarceration, he is at a highly elevated risk of serving that

2    entire period while those proceedings are pending, which could

3    be years, in an ICE facility.  That we think, your Honor, is a

4    very important consideration to have in mind.

5            Your Honor, the outpouring of letters from friends,

6    family members, coworkers and other acquaintances show

7    Mr. Aiyer to be a kind, caring, and generous person.  I can

8    truthfully say in my more than 20 years as a defense attorney,

9    I have never seen such an extensive and heartfelt show of

10   support ad it is completely consistent with the Akshay I have

11   come to know, a thoroughly decent person who made mistakes not

12   reflective of his general character almost 10 years ago.

13           Mr. Aiyer has been in a terrible personal and

14   professional limbo for six long years now, far longer than the

15   typical defendant in a criminal case, and I ask your Honor to

16   take this into consideration in passing sentence.  He is

17   terrified at the prospect of being removed from the United

18   States and never being permitted to return, and I ask you to

19   take this into consideration as well.  Most of all I ask you to

20   take into consideration his fundamental decency, the trait that

21   everyone who has had the good fortune of getting to know him

22   recognizes immediately.

23           Thank you.

24           THE COURT:  Thank you, Mr. Klotz.

25           Mr. Aiyer, have you reviewed the presentence report,

1    the recommendation, and the addendum and discussed them with

2    your lawyer?

3              THE DEFENDANT:  I have, your Honor.

4              THE COURT:  I've already said and other than what your

5    lawyer has already said, do you have any objections?

6              THE DEFENDANT:  No, your Honor.

7              THE COURT:  Okay.  I will listen to you now for

8    anything that you would like to tell me in connection with

9    sentence, any statement that you would like to make, anything

10   at all that you would like to tell me.

11             THE DEFENDANT:  Yes, your Honor.  I just want to say I

12   suffered a lot the last six years.  It's been the worse

13   experience of my like.  I've always tried to conduct myself

14   professionally with integrity and concern for others.  I always

15   prided myself for putting my clients' interests first.  It was

16   a profound shock to me to be investigated as a criminal, tried

17   as one and convicted as one.

18             I recognize that I have no one to blame but myself.  I

19   did things that were thoughtful, careless and unprofessional.

20   And when I saw others behaving similarly, I did not stand up an

21   object.  I did not use my best judgment and live up to my own

22   standards and for this I am very sorry.

23             My friends and family, my coworkers and the court

24   system and I know you yourself spent a lot of time on this case

25   and I thank you for that.

K9H6AIYS

1          Worst of all, I regret the pain I caused Alex, who

2    stood by me and been my strongest supporter.  About my family,

3    I was unable to be there when my grandmother and grandfather

4    passed away a couple months ago.  I lost my job and ruined my

5    career.  And I suffered from anxiety and stress and tried to

6    undergo counseling to cope with it the best I can.  More than

7    anything else, I may have to leave what I call home and built

8    as my home for the last 18 years.

9          I accept that you will pass sentence on me, I only ask

10   that you do so with compassion.

11         Thank you.

12         THE COURT:  Mr. Hart, has the government reviewed the

13   presentence report, the recommendation, and the addendum?

14         MR. HART:  Yes, it has, your Honor.

15         THE COURT:  Other than --

16         MR. HART:  I don't have any objections.

17         THE COURT:  Hold on.  Let me ask the question first.

18         MR. HART:  Okay.

19         THE COURT:  Other than all of the objections that I

20   have already dealt with, does the government have any

21   objections?

22         MR. HART:  No, your Honor.

23         THE COURT:  I will listen to you now for anything that

24   you would like to tell me in connection with sentence, any

25   statement that the government wishes to make.

K9H6AIYS

1          MR. HART:  Yes, your Honor.  Thank you.

2          First, I would like to address a couple points that

3     Mr. Klotz raised with respect to the fine and the profits of

4     the bank.  The government would like to note to the Court that

5     profit does not equal gain from the offense because we don't

6     know what would have happened if in fact there was competition.

7          COURT REPORTER:  Counsel, you are breaking up.

8          MR. HART:  The point I was making was that profit does

9     not equal gain from the offense because we don't know what

10    would have happened if there was in fact competition.  That is

11    why that is not a good measurement and that is why the

12    guidelines and one of the driving forces for you to use the

13    methodology to determine the volume of commerce.

14         Another issue I would like to raise, your Honor, is

15    something that the defendant's counsel talked about, others not

16    being prosecuted.  It is impermissible for the Court to

17    consider individuals or entities that were never prosecuted.

18    Section 3553(a)(6) is clear that a court must consider what the

19    need is to avoid unwarranted sentence disparities among similar

20    defendants with similar records who have been found guilty of

21    similar conduct.  There is no statutory nor Second Circuit

22    authority for considering similarly situated uncharged

23    offenders.  We direct the Court to *U.S. v. Douglas*, which

24    states: "Assuming without deciding that a district court may

25    take patterns of prosecutorial discretion into account in

K9H6AIYS

1   determining an equitable sentence that avoids unwarranted

2   disparities among similarly situated offenders an appellate

3   court is ill placed to assess whether a defendant is in fact

4   similarly situated to others whose circumstances, because they

5   Were never prosecuted, are unknown to us."

6           It is the government's position that that also is true

7   for trial judges.  To do so would improperly intrude on the

8   Executive Branch as acknowledge by the Supreme Court in *U.S. v.*

9   *Goodwin,* which --

10          COURT REPORTER:  Counsel, you have to repeat your last

11  sentence.

12          THE COURT:  And, counsel, please get closer to you

13  microphone because you are breaking up.

14          MR. HART:  I apologize, your Honor.

15          The sentence was:  To do so would intrude on the

16  Executive Branch as acknowledged by the Supreme Court in the

17  *United States v. Goodwin* where it held, In our criminal system,

18  the government retains raw discretion as to whom to prosecute.

19          The area I would like to touch on is the collateral

20  consequences from the defendant's alienage.  The Bureau of

21  Prisons and ICE policies related to the treatment of an alien

22  inmate are at least disfavored factors at sentencing.

23          COURT REPORTER:  Counsel, repeat the last sentence.

24          MR. HART:  BOP and ICE policies related to the

25  treatment of alien inmates are at least disfavored factors at

K9H6AIYS

```
1    sentencing and in this case are not extraordinary enough to

2    warrant a variance down to a noncustodial sentence.  Varying

3    downwards based on the conditions of confinement

4    inappropriately intrudes on the Bureau of Prisons' discretion

5    over the place and conditions of confinement of the inmate in

6    its charge.  ICE policies on detention of an immigrant prior to

7    removal are also not generally matters that a sentencing court

8    should consider.

9             THE COURT:  You are not coming through.  I see you on

10   the screen that you are talking, but I don't hear you.

11            MR. HART:  Can you hear me?

12            THE COURT:  Barely.

13            MR. HART:  Your Honor, may a take a moment to address

14   the situation?

15            THE COURT:  Absolutely.

16            (Pause)

17            MR. HART:  Your Honor, is that better?

18            THE COURT:  I can hear you.

19            Now I can't.

20            MR. HART:  Your Honor, perhaps it would be better if I

21   phoned in.

22            THE COURT:  Mr. Fletcher should be on the feed from

23   Skype.

24            Mr. Fletcher, you may want to call Mr. Griffincantz

25   for some assistance to see what can be done.
```

1          THE DEPUTY CLERK:  I will.  Let me email him.

2          THE COURT:  Thank you.

3          Mr. Griffincrantz is one of our court tech people.

4          MR. HART:  Your Honor, should I attempt to call in by

5     phone.

6          THE COURT:  Okay.

7          (Pause)

8          MR. HART:  Your Honor, can you hear me?

9          THE COURT:  Yes.  You are a little low.

10          MR. HART:  How about now, your Honor?

11          Appreciate everyone's patience.

12          To further address whether or not the defendant would

13     be ineligible or rather directed to a private facility, the

14     2018 policy that the defendant cites says only that such

15     prisoners should be identified or considered for consideration

16     for transfer to a private facility.  Also, the Bureau of

17     Prisons give weight to the initial recommendation in making

18     designation recommendations.

19          I also want to talk about the pandemic, COVID-19.  The

20     Bureau of Prisons has and continues to take affirmative

21     measures to ensure the health and safety of the inmates in its

22     charge.  For example, the Bureau of Prison has enhanced

23     screening techniques for staff and visitors; better isolating

24     and quarantine protocols, including the need to test negative

25     on multiple tests prior to reintegration; issue face coverings

K9H6AIYS

1   to inmates and staff; limit large groups and require face

2   coverings when social distancing is not possible; as well as

3   enacting better screening and control of prisoner transfers to

4   prevent commingling of both symptomatic and asymptomatic

5   inmates within the general inmate population.

6          Moreover, the defendant is 37 years old and healthy.

7   He does not have any chronic illnesses and has not been

8   hospitalized.  The only risk factor the defendant has

9   identified to the Court is his having slight trace of asthmatic

10  symptoms due to seasonal allergies to tree pollen.  Simply put,

11  he does not have severe or moderate asthma.  Even if he did,

12  the data suggests that a moderate to severe asthma condition

13  does not place a person as a higher risk of a serious outcome

14  from COVID.  The CDC has taken asthma off its risk factor list.

15  In fact, the government is unaware of the defendant having any

16  health condition that places him at a greater risk of a serious

17  outcome from the virus.

18         In addition, what could happen while the defendant is

19  incarcerated is too speculative at this point to bear any

20  significant weight.  To the extent the defendant is vying for

21  some sort of compassionate-release type consideration, it

22  simply is inappropriate to consider that at sentencing.  That

23  issue is not before the Court.

24         THE COURT:  Mr. Hart, could you hold on just a moment.

25  I hear you, but we don't have your video.  Have you decided not

K9H6AIYS

1    to continue with the video?

2           MR. HART:  No, your Honor.  I can see you and I see

3    the gentleman over your right shoulder.

4           THE COURT:  That gentleman is here to give some advice

5    on how to get your video on because we're not seeing you.

6           MR. HART:  Okay.

7           MR. KLOTZ:  We are in fact seeing Mr. Hart, your

8    Honor.

9           (Pause)

10          THE COURT:  We have you back on the screen.

11          You can proceed.

12          MR. HART:  Thank you, your Honor.

13          We ask the Court to sentence the defendant to a

14   guideline sentence because it is sufficient but not greater

15   than necessary to combine with the purposes of sentencing,

16   namely, that a sentence would reflect the seriousness of the

17   offense, promote respect for the law, and provide just

18   punishment for the offense and to afford adequate deterrence to

19   criminal conduct.

20          Moreover, a sentence with a significant period of

21   imprisonment would avoid unwarranted sentencing disparities

22   among defendants convicted of the same crime.  Here, this is a

23   very serious offense.  The guidelines are instructive in that

24   there is near universal agreement that restrictive agreements

25   can cause serious economic harm and that is exactly what

K9H6AIYS

happened here, your Honor.  In this case the defendant was one
of the most active and sophisticated traders in this market.
He conspired to rig bids in a number of emerging market
currencies over a period of several years.

The defendant and his coconspirators agreed to submit
specific prices when dealing with customers directly and on the
inner bank platform, and the defendant and his coconspirators
intended to affect the price of currency by manipulating the
forces of supply and demand.  His actions, and those of his
co-conspirators, not only violated important competitive
principles it undermined the integrity of the largest financial
market in the world, but also in some instances cheated these
customers who invested on behalf of pension funds and
retirement funds.

It is important to note that the defendant was aware
of the existence of the conspiracy and he actively sought to
join it and time and time again he worked with his
co-conspirators to further its goals.  The defendant was not an
unwitting participate of the conspiracy and he played an active
role as a director.  From the beginning, the defendant knew it
was wrong as evidenced by the exchange when his conspirators
suggested that his conspiracy to coordinate price quotes and
bids to customers are nice, he laughed and responded that they
probably shouldn't write such thing in Perma chat rooms.

In addition, the defendant took measures to conceal

K9H6AIYS

his conduct to avoid detection from the bank, including using

codewords, communicating on cell phones instead of recorded

bank lines, and meeting in person to discuss the conspiracy

with his coconspirators.  Such evidence demonstrates his

consciousness of wrongdoing.  In addition, in order to hold the

defendant solely accountable for his conduct, the defendant's

sentence should also take into account conduct related to fake

trades and spoofing.  This conduct was not accounted for in the

volume of commerce calculation but was intrinsic to the charged

conspiracy.

     To date despite a jury of his peers finding him guilty

he has not expressed any remorse.  In short, the defendant and

his co-conspirators were greedy and arrogant.  The defendant

and his co-conspirators routinely exploited a system over which

they had some power.  A guideline sentence is the appropriate

way to hold the defendant accountable for his criminal conduct

and for his disregard for the rule of law.  In addition, a

guideline sentence would also sere to deter other traders

driven by greed who may be tempted to cheat the system.

     We ask the Court to consider his background.  He was

well educated, a wealthy man and had a senior position at one

the world's largest financial institutions, a man of privilege

and a man of substantial means.  To be clear this was a crime

of opportunity and greed, not one out of necessary.

     There cannot be two justice systems -- one for

K9H6AIYS

white-collard criminals and one for everyone else.  The need

for general deterrence great.  A guideline sentence should

serve as a reminder to would-be white-collared criminals who

may engage the cost-benefit analysis before deciding to engage

in elicit activity.  Not meting out a guidelines sentence the

carries a significant period of incarceration runs the risk of

sending the wrong message to criminals that they will not be

held accountable and that potential penalties for violating the

law is a risk worth taking and is merely a cost of doing

business.

              THE COURT:  All right.  Thank you.

              I will place the presentence report, the

recommendation and the addendum in the record under seal.  The

parties should place their submissions in the record not under

seal -- they may have already done this -- after redacting any

personal identifying information.

              I adopt the findings of fact in the presentence report

except for the two changes that I already noted it the

guideline sentencing range for the fine.  The guideline

sentencing range for fines begins at $20,000, and I have

changed page 3 to reflect "none" for aliases.

              Therefore, I conclude that under the current

guidelines the total offense level is 21, the criminal history

category is one, and the guideline sentencing range is 37 to 46

months.  I appreciate that the guidelines are only advisory and

K9H6AIYS

1    that the Court must consider the various sentencing factors in

2    18, U.S.C., Section 3553(a) and impose a sentence that is

3    sufficient but no greater than necessary to comply with the

4    purposes set forth in Section 3553(a)(2).

5        The offense is very serious.  The defendant

6    participated in a conspiracy to fix prices and rig bids for

7    certain currencies.  The conspiracy involved millions of

8    dollars of transactions and involved several major banks and it

9    existed for over two and a half years.  The conspiracy

10   threatened the integrity of the market and showed disregard for

11   the legitimate expectations of customers who expected a

12   competitive market.

13       There is a hint in the defense submissions that the

14   defendant should not be held responsible because given the huge

15   civil settlements in other cases, everyone did it.  That

16   plainly is not an excuse nor a reasonable argument in

17   mitigation.  The chats indicate that the defendant was aware

18   that what he was doing was not lawful.  He suggested, for

19   example, that the comment about conspiracies being "nice"

20   should not be on Perma chat.  The defendant also argues that he

21   is somehow being singled out, but that ignores the fact that

22   there are two other co-conspirators who have pleaded guilty.

23       A substantial sentence is necessary to reflect the

24   seriousness of the offense, to promote respect for the law, and

25   to provide just punishment for the offense.  A substantial

K9H6AIYS

1   sentence is also necessary for deterrence.  There are

2   mitigating circumstances.  This is the defendant's first

3   offense and the crime is a nonviolent crime.  The defendant has

4   the support of his family and large group of friends and

5   colleagues dating back to his college days.  The defendant has

6   suffered collateral consequences, including the loss of his

7   job.

8          The investigation in this case has hung over the

9   defendant for an unusually long period of time.  The defense

10  argues that it is six years.  The defendant could have fled the

11  United States during that period of time but chose not to.  The

12  existence of the investigation has plainly been a serious toll

13  on the defendant.

14         The defendant may well be removed from the United

15  States as a result of his conviction.  Therefore, the need to

16  deter the defendant individually from future crimes and to

17  protect the public from the defendant are somewhat negated.

18  While it is true that there is a need for general deterrence,

19  the need general deterrence can never justify a sentence for an

20  individual that is greater than a just sentence for that

21  individual.

22         The defendant also relies on the existence of the

23  COVID-19 pandemic and argues that any sentence of imprisonment

24  should be avoided because the risk of his contracting COVID-19

25  in prison and the risk of his having serious consequences

K9H6AIYS

should argue against incarceration.  However, it does not

appear that the defendant is in a particularly high risk

category.  He is a relatively young person and his physical

problems are minimal.  Moreover, it is unclear what institution

the defendant could be sentenced to and what the conditions of

that institution may be.  To the extent that circumstances may

change, the defendant can always make subsequent applications

such as an application for compassionate release; but those

hypothetical considerations about future circumstances are

insufficient to avoid a sentence that is otherwise called for

to accomplish the purposes of Section 3553(a)(2).

The question is what is a sentence that is sufficient

but no greater than necessary to accomplish the purposes of

Section 3553(a)(2), where to the draw the balance.  On balance,

the Court intends to impose a sentence of eight months'

imprisonment on Count One to be followed by a two-year term of

supervised release with the standard conditions of supervised

release in this district and those recommended by the Probation

Department, except the Court will not include a term of

outpatient mental health treatment because there is no

indication that such treatment is needed.

I will also not include the conditions of access to

financial records and no additional credit charges because

those conditions are linked to an installment payment schedule,

which will not exist in this case.

K9H6AIYS

1          The Court will impose fine of $150,000 payable within

2     30 days.  The defendant has the ability to pay that fine based

3     on the presentence report.  The Court will not impose

4     restitution because the complex issues of fact related to the

5     amount of individual victims' losses and the calculation of

6     those losses would contemplate and prolong the sentencing

7     process to a degree that the need to provide restitution to pay

8     any victim is outweighed by the burden on the sentencing

9     process.

10          The Court will impose a $100 special assessment.

11          The Court will provide for voluntary surrender.

12          The Court intends to make the recommendation to the

13    Bureau of Prisons of imprisonment at a facility in the New York

14    City area so that the defendant can be close to his family; but

15    if defense counsel has any other recommendation with respect to

16    confinement, the Court is prepared to accept any such

17    recommendation.

18          The sentence that the Court has explained but not yet

19    imposed is consistent with the factors in Section 3553(a) and

20    is sufficient but no greater than necessary to comply with the

21    purposes of Section 3553(a)(2).  I have explained the reasons

22    for the sentence.

23          Before I actually impose the sentence, I will

24    recognize defense counsel and then the defendant and the

25    government for anything that they wish to say.

1           Mr. Klotz.

2           MR. KLOTZ:  Thank you, your Honor.  I think just for

3     the record I need to object to the sentence, but I won't say

4     anything beyond that.

5           I appreciate your Honor's recommendation that

6     Mr. Aiyer be assigned to a facility in the New York region.  I

7     would ask that you specifically recommend that he be assigned

8     to a minimum security camp in the New York city region.

9     Otisville would be an obvious candidate.  I think a facility

10    like that is a facility where he would be assigned were it not

11    for his citizenship status.  I am not certain how much weight

12    that recommendation will carry; but to the extent that it

13    carries any weight, I would appreciate your Honor making that

14    recommendation.

15          I would also ask, but I don't know that this needs to

16    be resolved before you impose sentence, that Mr. Aiyer be

17    continued on bail pending appeal rather than ask to surrender

18    voluntarily at some point down the road.  I am not sure if your

19    Honor wants us to address that now.

20          THE COURT:  I never tell parties what to do, but I

21    would suggest to you that it would not be in your interest to

22    make that application now because I plainly have the authority

23    to allow voluntary surrender and to set the date for voluntary

24    surrender.  For a stay of surrender pending appeal, there are

25    provisions in the statute that have to be satisfied, including

K9H6AIYS

1    that I find that an appeal is taken in good faith and that

2    there are meritorious issues on appeal, that those kinds of

3    arguments without any sort of briefing would not lend

4    themselves immediately to a decision.

5        I intend to impose voluntary surrender by 2:00 p.m. on

6    December 4, 2020, which means that you would have an

7    opportunity to make applications, and if those applications

8    were not successful before me to use any other avenues that

9    might be open to you.

10       MR. KLOTZ:  If that is the way your Honor wishes to

11   proceed, we would like an opportunity to brief this issue.  I

12   take it what your Honor is saying is that you will impose

13   sentence now and we can promptly then move, if we elect to do

14   so, for a continuation of bail rather than voluntary surrender

15   and you can decide that issue down the road.

16       THE COURT:  Yes.  I already told you that I don't

17   foreclose parties from doing anything that they think that they

18   have a right to do.

19       I have denied the motion for judgment of acquittal or

20   for a new trial in a lengthy opinion.  In order to release the

21   defendant pending appeal, I would have to find not only by

22   clear and convincing evidence that the defendant is not likely

23   to flee or pose a danger to the safety or other persons or the

24   community if released, which I could find, but that the appeal

25   is not for purposes of delay and raises a substantial question

1  of law or fact likely to result in a reversal, an order for a

2  new trial, or a sentence that does not include a term of

3  imprisonment or a reduced sentence to a term of imprisonment

4  less than the total time already spent.

5          In view of everything that I said in denying the

6  motion for a judgment of acquittal or for a new trial, it would

7  be difficult now to say that I thought that there were

8  substantial questions.  On the other hand, I never decide

9  anything until it's briefed on the facts and the law.  So it is

10  up to you.  If you want to make that application now, you can.

11          MR. KLOTZ:  No, your Honor.  I think our preference

12  would be to make the application promptly after we finish this

13  proceeding.  I would point out that the law on the standard is

14  it does not require your Honor to find that you are likely to

15  be reversed.  What it requires your Honor to find is that there

16  are serious issues and that if those issues were decided in

17  defendant's favor, which your Honor understandably thinks is

18  not likely.

19          THE COURT:  If anyone has another phone on, stop it.

20          By the way, if at any time a lawyer begins to talk to

21  me about reversal, I always say that I do what I believe the

22  facts and the law dictate and I welcome parties to take my

23  decisions to any other court.  One of the joys of being a

24  district court judge is that we know that nothing we do is ever

25  final and anything we do can be reviewed, and that is a matter

1    of comfort to us.  So when notions such as reversal are put out

2    there, my reaction is:  Do whatever you think is appropriate

3    for your client.  I do what I think under the facts and the law

4    I should do and I welcome review.  So don't feel reluctant.

5           MR. KLOTZ:  Thank you, your Honor.  I am not

6    reluctant.  I don't intend to press the application now.  We'll

7    do it subsequently on papers.  My point is I think the standard

8    is one that can be satisfied here without your Honor finding

9    that we're likely to prevail.  It doesn't require such a

10   finding.

11          THE COURT:  I understand the distinction.  I

12   understand the distinction.

13          Anything else, Mr. Klotz?

14          MR. KLOTZ:  No, your Honor.

15          THE COURT:  Mr. Aiyer, before --

16          MR. HART:  Your Honor, may I have a moment to speak.

17          THE COURT:  No. Hold on.  I am calling the parties in

18   order.  Mr. Klotz was first, Mr. Aiyer is second, and you are

19   third.

20          So, Mr. Aiyer, before I actually impose the sentence,

21   I will recognize you for anything you wish to tell me, anything

22   you would like to say on your behalf, anything at all you would

23   like to say.

24          THE DEFENDANT:  I would just like to apologize one

25   more time to my friends and family and to Alex.

K9H6AIYS

1          THE COURT:  Mr. Hart, I will recognize you for

2     anything the government wants to tell me before I actually

3     impose sentence.

4          MR. HART:  Yes, your Honor.  I just want to make the

5     record clear that the government opposes a downward variance

6     and believes that a guidelines sentence should be appropriate

7     here.

8          THE COURT:  Thank you.

9          Pursuant to the Sentencing Reform Act of 1984, it is

10    the judgment of this Court that the defendant, Akshay Aiyer, is

11    hereby committed to the custody of the Bureau of Prisons to be

12    imprisoned for a term of eight months on Count One.  I

13    recommend incarceration in the New York City area so that the

14    defendant can be close to his family.  I recommend

15    incarceration at a minimal security camp of the Bureau of

16    Prisons in the New York City area.

17         The defendant will voluntarily surrender to an

18    institution designated by the Bureau of Prisons by 2:00 p.m. on

19    December 4, 2020.

20         Upon release from imprisonment, the defendant shall be

21    placed on supervised release for a term of two years on Count

22    One.

23         Within 72 hours of release from the custody of the

24    Bureau of Prisons, the defendant shall report in person to the

25    Probation Office in the district to which the defendant is

K9H6AIYS

released.  While on supervised release, the defendant shall

comply with the standard conditions of supervised release in

this district.  The defendant shall not commit another federal,

state or local crime.  The defendant shall not possess a

firearm or destructive device as defined in 18, U.S.C., 921.

The defendant shall refrain from any unlawful use or possession

of a controlled substance.  The defendant shall submit to one

drug test within 15 days of release from imprisonment and at

least two periodic drug tests thereafter as directed by the

Probation officer.

          The defendant shall cooperate with the immigration

authorities and comply with all immigration laws.

          The defendant must cooperate in the collection of DNA

as directed by the Probation officer.

          It is further ordered that the defendant shall pay to

the United States a special assessment of $100, which shall be

due immediately.  The defendant shall pay a fine of $150,000,

which is payable within 30 days.

          I have already explained the reasons for the sentence.

          Does either counsel know of any legal reason why this

sentence should not be imposed as I have so stated it?

          MR. HART:  No, your Honor.

          MR. KLOTZ:  No, your Honor.

          THE COURT:  I order the sentence to be imposed as I so

stated it for all the reason I have explained.

K9H6AIYS

1          Mr. Aiyer, you have the right to appeal.  The notice

2     of appeal must be filed within 14 days after the entry of the

3     judgment of conviction.  The judgment of conviction is entered

4     promptly after the judge announces sentence.  So you should

5     discuss this issue promptly with your lawyer.  If you cannot

6     pay the cost of appeal, you have the right to apply for leave

7     to appeal in forma pauperis.  If you request, the clerk will

8     prepare and file a notice of appeal on your behalf immediately.

9          Do you understand?

10          THE DEFENDANT:  Yes.

11          THE COURT:  All right.  Mr. Hart, no open counts?

12          MR. HART:  No, your Honor.

13          THE COURT:  I usually ask as a matter of prudence for

14     the government to move to dismiss any open counts, but there is

15     clearly are no open counts here; is that right?

16          MR. HART:  There's Correct, your Honor.

17          THE COURT:  Mr. Klotz, do you agree?

18          MR. KLOTZ:  Agree, your Honor.

19          THE COURT:  So I will not do what I usually do.

20          Anything further?

21          MR. KLOTZ:  No, your Honor.

22          MR. HART:  Not from the government.

23          MR. KLOTZ:  Can I put you on mute and confer with my

24     colleagues?

25          THE COURT:  Yes.  You can mute yourself.

K9H6AIYS

1          Mr. Hart, if you have any lawyers on the telephone

2     line, you can consult with them, too.

3          MR. KLOTZ:  We have nothing further, your Honor.

4          THE COURT:  Nothing from the government?

5          MR. HART:  Nothing further, your Honor.

6          THE COURT:  Good-bye, all.

7                         o0o

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25